UNION SPECIAL MACH. CO. v. QUAKER CITY FLOUR MILLS CO.

QUAKER CITY FLOUR MILLS CO. v. UNION SPECIAL MACH. CO.

(Circuit Court of Appeals, Third Circuit.    August 2, 1917.)

Nos. 2201, 2202.

1. PATENTS ⟁⟁328—NOVELTY—USE OF PRIOR ART.
    Bigelow patent. No. 875,314, claims 67–75, inclusive, for a machine for sewing the mouths of filled sacks, is valid; the production of such machine not being, in view of the prior art, the mere exercise of mechanical skill in assembling existing mechanisms, but a problem calling for a high order of inventive genius.

2. PATENTS ⟁⟁328—INFRINGEMENT.
    Bigelow patent, No. 875,314, claims 67–75, inclusive, for a machine for sewing the mouths of filled sacks, *held* infringed by defendant's machine, which is illustrated by the drawings of the Burghardt patent, No. 766,111, for a thread cutter for bag-sewing machines, but which, in so far as the issues are concerned, does not purport to be made under a patent.

Cross-Appeals from the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Bill by the Union Special Machine Company against the Quaker City Flour Mills Company. Bill dismissed (236 Fed. 246), and complainant appeals; defendant prosecuting cross-appeal. Decree vacated, and record remanded, with directions.

Fraley & Paul, of Philadelphia, Pa. (Joseph C. Fraley, of Philadelphia, Pa., and C. L. Sturtevant and E. G. Mason, both of Washington, D. C., of counsel), for appellant.

J. Edgar Bull, of New York City, and Wm. N. Cromwell, of Chicago, Ill. (Cromwell, Greist & Warden, of Chicago, Ill., of counsel), for appellee.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

BUFFINGTON, Circuit Judge. In the court below the Union Special Machine Company filed a bill in equity against the Quaker City Flour Mills Company, charging infringement of two patents granted to it as assignee. One of said patents, No. 875,314, to John Bigelow, on December 31, 1907, was for a filled-bag sewing machine; the other, No. 875,339, to Charles H. Foster, also dated December 31, 1907, was for apparatus for delivering filled bags to sewing machines. That court adjudged each patent invalid as to the claims in suit, holding, in an opinion reported at 236 Fed. 246, that:

"In view of the prior art, the subject-matter claimed therein involved only the exercise of mechanical skill, and did not require invention."

The case is an important one. It concerns machines in general use, of high mechanical effectiveness, and of much economic and commercial value in industries where the mouths of filled bags of different sizes are sewed. The plaintiff is a large manufacturer of special sewing machines for factory, as distinguished from domestic, use, and,

while the defendant is engaged in milling flour, its bag-sewing machine is manufactured by the Washburn-Crosby Company, which is defending this test case. No questions of title or accounting for past profits are here involved, and the purpose of the parties is to make this a test case between the two manufacturers. It will therefore be seen the issues involved are simply validity and infringement.

[1] Turning first to the question of validity, we note that it is now clear that the successful solution of the problem of constructing a filled-bag sewing machine involves the successful co-ordination of several dependent mechanical elements. In the first place, for successful commercial practice, it is necessary that the passage of the bags on the endless conveyor be rapid; otherwise, the machine could not be used. In the next place, for mechanical reasons, it is necessary that the travel of the bags be continuous and nonintermittent, as it is obvious that a conveyor should not be subjected to the sudden and numerous jerks incident to an intermittent, interrupted forward movement of a number of heavy filled bags. In the next place, the sewing by machine of a fabric requires that there must be an intermittent dwell or interrupted movement of the fabric during the instant the needle is in it. It follows, therefore, that to make a bag-sewing machine mechanically operative, that portion of the bag which is immediately adjacent to the stitch-forming mechanism, and which is being sewed, must have an intermittent forward movement to permit needle disengagement from the fabric, while at the same time there must be a continuous, nonintermittent advance of the main body or bulk of the bag; in other words, there must be a distinct, individual, intermittent fabric feed, and a distinct, individual, continuous bag feed, different in themselves, but so coupled and co-ordinated by combining mechanism that the continuous travel of the body of the bag and the intermittent travel of the mouth of the bag shall be actuated from a single driving shaft, so as not to conflict with each other.

That filled bags could be conveyed rapidly was, of course, well known. That filled bags could be successfully machine sewed was equally well known. That bag conveyance was and must be continuous and nonintermittent, and that sewing was and must be intermittent, were recognized facts. It was, however, to the very difficult problem of the harmonizing of these two latter seemingly, antagonistic, indispensable factors, that the patent of Bigelow was, in the claims here concerned, addressed. In addition to the above antagonistic elements of fabric feed and bag feed, three other complicating factors were also involved. In the first place, the bag was filled and open-mouthed, and it had to stand upright on the conveyor; hence the sewing mechanism had to overhang the upright bag, and therefore the fabric to be sewed must be presented to the needle in a vertical position, and the needle must reciprocate back and forth in a horizontal, instead of in the customary vertical, way. Moreover, as the bags themselves were of different heights, it is evident that the conveyor, which has continuous motion, as we have seen, and had to be co-ordinated to the intermittent motion requirement of the sew-

ing mechanism, had to be so constructed that it could be adjusted to handle different heights of bags without disturbing such co-ordinated relation between it and the sewing machine. These several features are aptly described by one of the plaintiff's witnesses in these words:

"In such a machine it is important that the feed or carrier belt or conveyor should be capable of being moved up and down relatively to the sewing machine, so that the same machine may be used for bags of different sizes. The movement of the conveyor or carrier belt is automatic; it being fed or moved along by a connection with the same driving mechanism which drives the stitching mechanism, thereby insuring a proper feed of the bag as the stitching proceeds. This involves co-ordination between the automatic driving mechanism and the mechanism for raising and lowering the carrier belt, in order that the carrier belt may be driven at the proper speed, irrespective of its elevation. The feed of the material in an ordinary sewing machine is commonly an intermittent or step-by-step feed. In dealing, however, with so large a weight as a filled bag, it is important that it should be fed continuously, to avoid the abrupt movement of an intermittent feed."

The final development in this art of a successful filled-bag sewing machine has now brought into clear light that these fundamental factors and conflicting elements confronted the art, and had to be overcome and co-ordinated, if a commercially successful machine was to be produced. It is also clear from the testimony that the need of such a machine was felt in the art, that sewing machine constructing companies of long experience recognized the difficulty of its solution, and that men of large mechanical ability addressed themselves to the problem. It has therefore seemed probable to us from the proofs that the production of such a machine was not the mere exercise of mechanical skill in assembling existing mechanisms, but rather a problem that called for a high order of inventive genius. That such was then the view of those versed in the art is shown by the correspondence in 1897 between two such experienced firms as the Washburn-Crosby Company, the real defendant in this case, and the well-known Willcox & Gibbs Sewing Machine Company. The letter which is printed in the margin [1] shows that the Washburn-Crosby Company were un-

[1] New York, November 16, 1897.

Washburn-Crosby Co., Minneapolis, Minn.—Gentlemen: We duly received your esteemed favor of October 21st, and since its receipt have had under consideration this matter of *stitching the mouths of flour sacks when filled.* Several of our experts have looked the subject over, and we regret to say to you that none of them are able to advise us that the thing is very easy of accomplishment, nor is it very clear to any of them how the thing is to be done at all, and, under any circumstances, it cannot be discovered that there is very much money in this thing, however well it might be done. You tell us in yours of October 21st that some Chicago people already have "a large machine for packing seeds and grain from the spout and sewing them into the automatic stitch." It would seem to us (and the same recommendation comes from every one who has looked into this matter in your behalf) that those are the people to go to, to get done the work you want on flour sacks. If they have got so far as to have a machine successfully working in the stitching of sacks filled with seeds, it would appear to be a simple matter to apply it to sacks filled with flour. If we wanted anything of this kind done, we should betake ourselves at once to these Chicago people, in preference to attempting any device of our own getting up. In this way we should avail of experience already gained, and in all probability find the broad ground so covered with patents by these Chicago people as to make anything outside

able to solve the problem of a filled-bag sewing machine, and had appealed for help to the Willcox people. The experts of the latter, however, were unable to see how it could be done, but advised the Washburn people to confer with Bigelow, the patentee, as a man with large experience in mechanical matters. It is also clear that the Timewell machine, made under patent No. 607,810 of July, 1898, applied for July 31, 1897, and several others, and which is now urged as an anticipation, was confessedly inadequate to meet the standard of efficiency required in a commercially successful bag-sewing machine. In that regard the testimony of Harding, the superintendent of the Washburn-Crosby Company, was that they returned the Timewell machine to the manufacturer because it was not a success in their work; that he suggested some changes, which were made; that these were not successful, and the machine was again returned to the Timewell people. As to the capacity of the machine, the testimony of Scott, a millwright, was:

"We can sew all the way from 6 to 10 bags per minute, but 6 bags a minute is about as fast as they can handle them and truck them away, 100-pound bags."

So, also, Harding's testimony was:

"Q. Do you know about how many bags per minute or per hour you were able to sew with that machine? A. I think while the machine was running we were able to sew about 6 or 8 a minute. Q. Is that sufficient speed to make a machine of that kind desirable and profitable to the owner? A. It is not. Q. In your opinion, about how many sacks per minute ought to be the capacity of a machine to be a successful and desirable one for that purpose? A. From 15 to 20."

From the testimony of the same witness, it appears that he himself sought to solve the problem, and had a machine built, but that even a skilled operator was only able to get a speed of from 12 to 15 per minute on it, and that its use was finally abandoned. From our examination of the prior art, we may regard Timewell as the high-water mark of development prior to Bigelow; but as such it is clear that it left no impress on the milling industry, and had it, or indeed any other attempt prior to Bigelow, been all the art developed, that art would never have gone to the use of bags and the discard, in large part, of barrels. Moreover, it is clear that in Bigelow selecting from the prior art the separate individual elements not only was a wise choice required in the selection of usuable elements, but there was a corresponding wisdom required in discarding elements or parts of elements

of them somewhat inefficient. Mr. John Bigelow, of your city, is a long-time friend of ours, and during the past week he was in here. Being in the same business as yourselves, we interviewed him on the subject and went over the correspondence. He suggests that upon his return to Minneapolis he will look into the matter a little, and he thinks, if you will see him, a talk over the matter might be interesting and to your benefit. Mr. Bigelow has had a large experience in mechanical matters. We wish, after his return home (which will be about the 1st of December), you will see him for a talk; he will give you some idea of how we feel about this subject.

   Yours very truly,   [Signed] Willcox & Gibbs S. M. Co.,
                   J. Parmly, Treasu.

inconsistent with the co-ordination essential to the successful working of a bag-sewing machine. The state of the art when Bigelow turned his attention to it, and its failings, and what he had to do, are fairly set forth in the summary made by counsel, viz.:

"In the case of the Timewell machine, which constituted the high-water mark of the prior art, the inventor mutilated the sewing machine, by omitting its feed mechanism, and thus precluded the possibility of proper co-operation between the needle and the feed of the fabric, so that imperfect sewing and breakage of needles must occur. So, also, the frame of the machine was made to completely inclose the critical portion of the bag where the stitching was being performed, and hence the operator could not have access thereto at the critical moment. The fabric at the region of the seam was rigidly clamped in a vertical plane. * * * The prior patentees, Onderdonk and Williams, associated a complete sewing machine (which otherwise might have worked properly) with a belt driven wholly by gravity, and consequently at a nonuniform rate, and without the co-ordination between the progress of the bag, as a whole, and the progress of the seam, as an individual part of that whole. Curtis and Timewell, who employed an adjustable carrier, persisted in driving it by a chain and sprocket device, which would not permit the carrier to be raised or lowered without at the same time actuating it backwards and forwards. Curtis had no supporting table, and only raised or lowered one end of the carrier. Taking the most extreme view against the Bigelow invention, and asserting that he only took one element from one inventor, a second element from another inventor, and so on, his work has this double aspect: First, intelligent recognition of the proper elements to select for a total new combination; and, second, rejection of certain structural features which theretofore had been associated with these elements in old combinations, and which would have precluded the realization of their latent possibilities, if united in the total new combination. These mistakes in the former machines were due to the fact that the inventors did not appreciate the tout ensemble, and failed to see the practical disadvantage of certain structural features. Bigelow, on the other hand, not only perceived all the desiderata, for the total combination, but recognized the non desiderata of various old elements, and eliminated the disadvantageous details. * * * In popular language, Bigelow found certain very desirable elements of the prior art, in bad company. He disassociated the individuals from their undesirable companions and recombined them in such form as to permit the efficient assertion of their own best qualities."

Bearing these matters in mind, we turn to the disclosure made by Bigelow, first noting that his machine, in addition to the co-operating mechanism adapted to the sewing and the conveying of the bags and for adjustment of the conveyor to different sized bags, also embodied other mechanism; e. g., for cutting thread, etc., which need not be here discussed. Putting, therefore, these nonessential matters aside, it suffices to examine the specification with a view to understanding the several claims which embody the sewing, conveying, and conveyor adjusting features above referred to; and in that connection it should be noted that Bigelow developed these different separate features of his machine at different times, and his testimony that he completed his machine at a certain time must be understood, not as referring to the completion of these separate agencies involved in the present case, but to the completion of the machine as a whole and involving these other mechanisms. Turning, therefore, to the patent, and confining our attention to the sewing, conveying, and the conveyor adjusting mechanism, and to the mechanism by which these three elements are co-ordinated, we note that Bigelow states:

"The invention relates to means for sewing filled bags; and the object of the invention is to provide means whereby bags of flour or other material may be quickly closed and sewed. A machine for this work must be capable of holding the filled bags, grasping the folded tops thereof, feeding the same to the sewing machine proper, sewing the bag top, and clipping the thread, so that the bag will be delivered from the machine ready for shipment. Such a machine should be constructed and adapted for very rapid operation, and in order to permit the same, and the rapid manipulation of the parts by the operator and in accordance with the hand movements that are required, it becomes necessary to add many novel features to the sewing machine as it is commonly known. Portability is another feature which it is desirable to secure, as a single bag-sewing machine, if capable of being moved about a mill, will take care of the product of a number of packers. The difficulties that arise in this art are due to the weight of the bags to be handled, the lack of uniformity both in shape and size of the bags, the nature of the cloth or the paper from which the bags are made, the adjustments necessary in the sewing and feeding members, the necessity for stopping and starting the machine frequently, and the weight and cost of the mechanism that must be assembled to perform the various functions of a bag-sewing machine. These difficulties I have avoided in the invention fully described and claimed hereinafter."

He further says:

"My invention may be briefly described as comprising a frame carrying an adjustable automatic feeding table and a sewing head, which latter comprises a stitch-forming mechanism provided with a much longer work plate than usual, and which work plate carries or has associated with it an automatic bag starting and feeding mechanism, wherein the operator may arrange the flap of the bag when the machine is stopped, and which mechanism will automatically feed the bag forward to the sewing mechanism when the machine is started."

Turning to Figure 1, we note, first, that the central and novel element in combination of Bigelow's machine, around which all the elements here concerned center, and which co-ordinates the sewing feed, the bag feed, and the conveyor shift, is the (brown) telescopic shaft member, *100*. Turning first to the conveyor, we note that it consists of the rigid (yellow) table *12*, over which moves the (green) flexible belt *23* which travels on (purple) pulleys *28* and *27*, the latter being driven from the head of the machine. This table, *12*, is adjustable vertically (see Figure 3).

"The table preferably comprises a long plank or plate *12*, fastened upon the brackets *13*, which have horizontal extensions or ends *14* (see Figure 1) adapted to slide up and down upon the guideposts *4*, being arranged upon opposite sides of the sleeve *5*. The backs of the brackets *13* are provided with the racks *15*, with which the pinions *16* mesh. These pinions *16* are fixed upon the shaft *17*, having bearings in the tops of the brackets *6*, and provided with a handwheel *18* at one end. By turning the handwheel the brackets *13* and hence the table *12* may be raised and lowered. For securing the table at the desired elevation I provide the pawls *19* to engage the pinions *16*. These pawls, in order that they may be adjusted at the same time, are preferably placed upon a single shaft *20*, held in the tops of brackets *6*, and which shaft may be rocked by the handle *21* thereon, which being thrown back will withdraw the pawls from the pinions."

It will be noted that the shaft *27'* of (purple) pulley *27*, which actuates the conveyor, intermeshes (see Figure 7) with the dominating (brown) telescopic shaft *100*.

FIG. 5.

FIG. 7.

Turning next to the sewing mechanism, we note (see Figure 5) that the (saffron) machine head is mounted on bracket *34* and overhangs the feed table. As it is stated in the patent in suit that any conventional form of bag-sewing machine can be used, and as the particular type here employed is a matter of indifference, we refrain from a detailed description of the sewing machine, and confine ourselves to pointing out that its intermittent feed is controlled by engagement with the (brown) dominant telescopic shaft *100*. In that regard, referring to the feed bar *45* (a number on patent sketches not here shown) Bigelow says:

"The whole forward edge of the bar is toothed or serrated. As the (saffron) operating shaft *37* of the sewing head is rotated, the bar will be alternately moved out through the work plate and toward the needle, and drawn back and returned, to *intermittently* advance the goods or fabric upon the work plate."

That this intermittent feed of the sewing mechanism is regulated by the (brown) telescopic shaft *100*, is shown by Fig. 5, where (saffron) shaft *37* is provided with (pink) cog *95*, which intermeshes with cog *94* mounted on (blue) shaft *89*, provided with threads *98* engaging cogged wheel *99*, mounted on (brown) dominating shaft *100*, which also dominates the various mechanisms extending by another path from the outer end of (blue) shaft *89*, through parts *93*, *109*, *110*, etc., to the sewing head.

The operation and function of the (brown) dominating telescopic shaft *100* is thus described by the patentee:

"The feed on drag belt *23* on the table *12* moves very slowly compared to the shaft *37* of the sewing head, *but should be driven from the same shaft in order that it may be started and stopped in exact time with said shaft 37 and the parts dependent thereon.* Therefore I provide the (blue) shaft *89* with a worm to drive the worm gear *99* on the upper end of the (brown) telescoping shaft *100*. The lower end of this telescoping shaft (see Figure 7) is connected with the shaft *27'* (see Figure 4) of the (purple) belt pulley *27* by the bevel gears *101* and *102*. The ends of the shaft *100* are held in yokes *103* and *104*, journaled respectively upon the shafts *89* and *27'*. A *slow* movement is thus communicated to the feed belt of the *table, and this movement remains constant and positive*, regardless of the height to which the table is adjusted."

It will thus be seen that the telescopic shaft *100* is the element which served to co-ordinate and properly synchronize the intermittent feed of the sewing machine and the continuous feed of the conveyor, and that it also, by its telescopic function, enabled the table to be shifted vertically without affecting the co ordination of such bag and fabric feeds. This telescopic shaft, in itself a known mechanical agency, had never before been used for the purpose of co-ordinating the fabric and bag feed of a bag-sewing machine, and to our mind the use of its function in such art was novel, useful, and of marked inventive character. It follows, therefore, the patent for such device is valid, if Bigelow was the inventor thereof. In that regard we have the record of the interference between him and Foster, the patentee of No. 875,- 339, wherein Bigelow was awarded priority, and the grant to him of the generic claims involved in such interference.

The status of the bag-sewing art in 1894 is shown in patent No. 529,769, granted to Williams that year, wherein he says:

"Heretofore it has been the common practice, in flour mills and other establishments where cotton sacks or sacks of other fabric are employed, to sew the lips of the same together by hand, which, as is well known, is a slow and tedious process. The closing of the sacks by machine such as herein described must, as will readily be seen, not only result in the sack being rapidly closed, but in the production of such close and uniform stitches as to prevent the leakage or sifting through of the powdered or pulverized contents of the sack."

This shows the art was then practically without any mechanical sewing device. It is quite clear that Williams' contribution to the art was of small moment; that it left no practical impress upon it; that it wholly lacked the telescopic bar of Bigelow, and embodied no mechanism or relation of parts which in any degree suggested the use of such co-ordinating member between a sewing mechanism and a conveyor. In Williams, the conveyor moved by gravity—had no co-ordinating relation to the sewing mechanism. Indeed, we may dismiss Williams from the situation by saying we agree with the estimate of his device given in defendant's brief, viz.:

"A bag-sewing device in its most primitive and elementary form."

Three years later Onderdonk, by patent No. 583,388, of May 25, 1897, disclosed a filled-bag sewing machine in which there was an inclined feeding mechanism and an overhang sewing machine; but it lacked any co-ordinating shaft connection between the sewing mechanism and the conveyor, the latter being moved by gravity and a foot brake used to prevent its too rapid movement. It is needless to say its separate, non-co-ordinated movement of fabric feed and bag feed shows that Onderdonk was wholly lacking in the connecting mechanism which gave inventive character to Bigelow's disclosure. Both Williams and Onderdonk, lacking this central and co-ordinating element, had no commercial value, and it is quite apparent that other designers realized the problem of a filled-bag sewing machine was not solved by them, and that there was room and a call for those further efforts evidenced by the efforts of Foster and Harding. We have not overlooked the contention, earnestly made, that Bigelow was visited with knowledge of what Williams and Onderdonk did, and that by combining features separately disclosed in the two and adding known mechanical agencies he evolved his machine. Of course, Bigelow is visited with knowledge of those devices and of the functional work of their several parts. But what, after all, did Williams and Onderdonk teach Bigelow, but the way to the scrap heap?

Of the work of the Timewell Company we have already spoken; but, in view of the fact that the evidence shows that the Timewell machine, as well as an attempted improvement of it by Harding, a man experienced in the art, were unsuccessful, we deem it needless to discuss its mechanism, simply noting that one all-sufficient reason for failure of machines of that type can be attributed to limitations set forth in a criticism of them by Curtis in patent No. 639,216, of December 19, 1899, for a filled-sack sewing machine, where he says:

"In both these types of machines the forward movement or travel of the holder or sewing mechanism, the one in respect to the other, is relied upon to accomplish the feed of the sack mouth to the needle during the sewing opera-

tion and to hold the sack mouth in position against the thrust of the needle; the sewing mechanism itself not having the customary feed device."

In other words, the Timewell machines had no intermittent feed movement, but had simply the continuous feed movement of the conveyor. Apart from the other consideration of the machine not being of the speed required, this characteristic of the Timewell device, viz. absence of intermittent bag feed, stamped it as of a different class from Bigelow's.

We turn next to this Curtis patent, No. 639,216, just referred to. It was taken out by Curtis' assignee, the Timewell Sack-Filling & Sewing Machine Company, which company, as we have already noted, had attempted unsuccessfully to make a bag-filling sewing machine for the Washburn-Crosby Company. The proofs show that Curtis, the patentee, was familiar with the Timewell patents and had made the drawings for a number of them. He was called by defendant as a witness, and was evidently familiar with the development of the Timewell machines. He gave no testimony whatever as to the use of his own device, whether any practical use had been made of it, or, indeed, whether a machine embodying its features had ever been constructed. In view of the business in which the Timewell Company was engaged, of its desire to make a successful machine, its inability to do so, its ownership of the Curtis patent, and of Curtis himself being on the stand and silent as to its merits, we are justified in regarding this patent as representative of the mere paper, as contrasted with the practical art. To allow such paper failure of Curtis to nullify the practical success of Bigelow would defeat the whole spirit of the patent law, which seeks to reward successful disclosures and avoids nullifying such successful disclosures by abortive and unsuccessful suggestions. We do justice to the situation by refusing to give to the Curtis patent any more practical weight than its patentee, its owner, and the art gave it, which was no merit whatever. We may add, further, that we are satisfied, as noted below, that the combination of elements in the claims here involved was completed by Bigelow before March 27, 1899, and therefore, whatever the significance of Curtis' patent, the application for which was made March 27, 1899, it could not affect the earlier invention of Bigelow.

This brings us to a consideration of Harding's alleged prior use. The court below found against Harding on this issue, and with that finding we agree. We have carefully considered the contentions as to Harding's machine, as it was originally built and as it has been since altered. It would serve no useful purpose to here enter upon a lengthy discussion of the evidence, since our conclusion is that, whatever the alterations that have since been made upon the machine were, and however much or little they changed the Harding machine, three things stand out in uncontradicted prominence, viz.: First, Harding was a man in authority in a business where there was a call for a successful bag-sewing machine; second, that with power to use his own machine for such work, it was not after trial used by

his own company; and, third, Harding's own letter of March 31, 1899, in which he says:

"The Union Special Sewing Machine Co., Chicago, Illinois—Gentlemen: The writer learned in a roundabout way that you have a sewing machine sewing sugar sack. We have been agitating the sewing of our small sack, by power, for some two years back, but up to this time have nothing satisfactory to do the work. If you have perfected anything that will do our work rapidly, we should be pleased to hear all about it and try one of the machines at once. Kindly address the writer care of this company"

—clearly shows either that at that date he had produced no machine of his own, or that, if he had produced one, it would not do the work. The evidence clearly satisfies us that, while Bigelow did not complete his machine as a whole until midsummer, 1899, that part of his machine which is embodied in the claims here in issue was conceived and perfected by him in advance of March 27, 1899. We are therefore of opinion, as was the court below, that no such prior use by Harding has been established as will invalidate the claims here involved.

[2] We turn next to the question of infringement. This involves the several claims quoted in the margin.[2] They all involve, in various terms, the mechanical operation effected in Bigelow's machine by the (brown) telescopic shaft, marked *100*, which co-ordinates the

[2] 67. An apparatus for feeding and sewing filled sacks, including a supporting framework and a driving shaft, a sewing mechanism, connections between the two for operating the latter, said sewing mechanism embodying a head overhanging the edge of the framework, a conveying mechanism outside the framework and in proper relation to the sewing mechanism, with connections between the conveying mechanism and driving shaft, for operating the former, and means for adjusting the conveying mechanism bodily with respect to the sewing mechanism, and simultaneously automatically adjusting its operative connections with the driving shaft, substantially as described.

68. An apparatus for feeding and sewing filled sacks, including a supporting framework, and a driving shaft, a sewing mechanism, said sewing mechanism being arranged to overhang the edge of the framework, connections between the driving shaft and the sewing mechanism for operating the latter, a conveying mechanism arranged outside the framework and in proper relation to the sewing mechanism, and including a horizontal endless carrying belt, connections between the same and the driving shaft for operating said conveying mechanism, and means for adjusting the conveying mechanism bodily with respect to the sewing mechanism, and simultaneously automatically adjusting its operative connections with the driving shaft, substantially as described.

69. In an organized apparatus for feeding and sewing filled sacks, a suitable supporting framework, a sewing mechanism thereon, a driving shaft, a horizontal conveying mechanism outside the supporting framework, connections between the driving shaft and the sewing mechanism and between the driving shaft and the conveying mechanism, and means for raising and lowering the conveying mechanism bodily and simultaneously raising and lowering the operative connections between the conveying mechanism and the driving shaft, substantially as described.

70. The combination in a filled-bag sewing machine, with a sewing head of a table, open at one side to receive the filled bags, a driven carrier belt arranged upon said table and adapted to continuously move the filled bags along said table and past said sewing head, driving connections for the carrier belt and the sewing mechanism, and means for relatively adjusting the

UNION SPECIAL MACH. CO. V. QUAKER CITY FLOUR MILLS CO. 567

sewing feed and the bag feed. They were framed by the Patent Office and constituted the issue in the interference proceeding between Bigelow and Foster. On the determination of that issue in favor of the former, these claims, which embody the real gist of Bigelow's invention, were embodied in Bigelow's application at the suggestion of the Patent Office authorities.

The defendant's machine is illustrated by the drawings of patent No. 766,111, granted August 23, 1904, to E. H. Burghardt, for a thread cutter for bag-sewing machines. It should be noted that, while the defendant's machine is represented in Burghardt's patent, that such patent being for a thread cutter only, which is not here involved, the defendant's machine, in so far as the issues here involved are concerned, does not purport to be made under a patent. Turning to the claims of Bigelow, we note, for example, that in claims 67 and 68 is the element, "Means for adjusting the conveying mechanism bodily with respect to the sewing mechanism and simultaneously automatically adjusting its operative connections with the driving shaft;" in claim 69, "connections between the driving shaft and the sewing mechanism and between the driving shaft and the conveying mechanism;" in claim 70, "driving connections for the carrier belt and the sewing mechanism;" and in 71, "means for relatively adjusting the

sewing head and table, and means for maintaining the driving connections in various adjusted positions.

71. An organized machine for feeding and sewing filled sacks, a suitable supporting framework, a sewing mechanism thereon, a driving shaft, a conveying mechanism outside the supporting framework, operative connections between the driving shaft and the sewing mechanism and between the driving shaft and the conveying mechanism, and means for relatively adjusting the sewing mechanism and the conveying mechanism and simultaneously adjusting said operative connections between the driving shaft and the conveying mechanism, substantially as described.

72. The combination in a filled-bag sewing machine of a sewing head, a table open at one side to receive the filled bags, and a driven carrier belt supported upon said table and adapted to continuously move along the upper face of said table to carry the filled bags along the same and past the sewing head, substantially as described.

73. An organized apparatus for feeding and sewing filled sacks, comprising a table, open at one side, to receive the filled sacks, a sewing head carrying stitck-forming mechanism overhanging the table, a driven carrier, arranged upon said table, and adapted to move the filled sacks along the table and past the sewing head, and means for relatively adjusting the sewing head and table whereby varying sizes of sacks may be sewed, substantially as described.

74. An organized apparatus for feeding and sewing filled sacks, comprising a supporting framework, a sewing head supported thereby and projecting beyond the edge of said framework and carrying a needle reciprocating substantially horizontally, a table beneath the sewing head, and a carrier on said table upon which the filled sacks are supported, means for operating the carrier, and means for relatively adjusting the sewing head and carrier, substantially as described.

75. An organized apparatus for feeding and sewing filled sacks, comprising a supporting framework, a sewing head supported thereby and projecting beyond the edge of said framework and carrying a needle reciprocating substantially horizontally, a driven carrier arranged beneath the sewing head upon which the filled sacks are supported and fed past the sewing mechanism, and means for operating the carrier, and means for relatively adjusting the sewing head and carrier, substantially as described."

sewing mechanism and the conveying mechanism, and simultaneously adjusting said operative connections between the driving shaft and the conveying mechanism."

The claims embodying this general element of means for so connecting the stitch and bag progression were in the interference proceeding, as we have seen, awarded Bigelow, who illustrated such means by a two-part shaft, one part telescoping within the other, and relative engagement between the two parts being maintained by means of a longitudinal spline and groove. It will thus be seen that the generic claim for means was awarded Bigelow, while a claim, inter alia, for the specific means of a sliding worm splined upon a one-part shaft and engaging a worm wheel, was allowed to Foster. Now, as Foster's claim was specific, and was servient to Bigelow's generic claim for means, it is manifest that defendant, who has followed Foster's specific means, has thereby subjected itself to the generic claim of Bigelow. As the claims of Bigelow we have cited afford ground for enjoining the defendant's machine, and no accounting is here involved, we limit ourselves to holding claims from 67 to 75, both inclusive, are infringed. Although no appeal was taken as to the finding of the court below in reference to the Foster patent, that patent has necessarily been considered as a part of the history of the case; but it is proper to add that we are not to be understood as passing upon the question of its validity.

The decree below will therefore be vacated, and the record remanded to that court, with directions to reinstate the bill, to enter a decree adjudging claims 67 to 75, inclusive, of Bigelow's patent, valid and infringed, and to issue an injunction thereunder.